Kelly M. Dermody (CA Bar No. 171716)
kdermody@lchb.com
Fabrice N. Vincent (CA Bar No. 160780)
fvincent@lchb.com
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Telephone:  415.956.1000
Facsimile:  415.956.1008

Lisa Holder (CA Bar No. 212628)
lholder@equaljusticesociety.org
Mona Tawatao (CA Bar No. 128779)
mtawatao@equaljusticesociety.org
EQUAL JUSTICE SOCIETY
1939 Harrison Street, Suite 818
Oakland, CA 94612
Telephone: 415.288.8700
Facsimile: 415.484.1530

*Attorneys for Plaintiff*
*(additional counsel listed on signature block)*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA WESTERN DIVISION

| | |
|---|---|
| TAMARA BRYANT,<br><br>                    Plaintiff,<br><br>v.<br><br>L'ORÉAL USA, INC, L'ORÉAL USA PRODUCTS, INC., SOFT SHEEN-CARSON, LLC., SOFT SHEEN PRODUCTS, INC., DERMOVIVA SKIN ESSENTIALS INC., DABUR INTERNATIONAL LTD., and NAMASTE LABORATORIES, LLC, STRENGTH OF NATURE, LLC, and GODREJ SON HOLDINGS, INC.<br><br>                    Defendants. | Case No. 2:23-cv-287<br><br>**<u>CIVIL ACTION COMPLAINT</u>**<br><br>Jury Trial Demanded |

Plaintiff, Tamara Bryant, by her undersigned counsel, makes the following

Complaint against Defendants L'Oréal USA, Inc., L'Oréal USA Products, Inc., Soft

2735069.3                                                                                                        COMPLAINT

Sheen-Carson LLC., Soft Sheen Products, Inc. ("L'Oréal"), DermoViva Skin Essentials Inc., Dabur International Ltd. and Namaste Laboratories, LLC ("Namaste"), and Strength of Nature, LLC ("Strength of Nature"), Godrej SON Holdings, Inc. ("Godrej") (collectively, "Defendants"), alleging as follows:

## NATURE OF THE ACTION

1.      This action arises out of Tamara Bryant's diagnosis of uterine cancer. Ms. Bryant's uterine cancer was directly and proximately caused by her regular and prolonged exposure to phthalates and other endocrine disrupting chemicals found in Defendants' hair relaxers.

2.      Plaintiff brings this action against Defendants for claims arising from the direct and proximate result of Defendants, their directors, agents, heirs and assigns, and/or their corporate predecessors' negligent, willful, and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, distribution, labeling, and/or sale of the products known as Dark & Lovely, ORS Olive Oil Relaxer, Just for Me, and African Pride (together, the "Products").

## II.   PARTIES

3.      Plaintiff is a citizen and resident of the State of California with her place of residence in Los Angeles, California.

4.      Defendant L'Oréal USA, Inc. is, and at all times relevant to this action was, a corporation with its principal place of business and headquarters located at 575 Fifth Avenue, New York, New York 10017 and process may be served upon its registered agent, Corporation Service Company, 80 State Street, Albany, NY 12207.

5.      Defendant L'Oréal USA Products, Inc. is, and at all times relevant to this action was, a corporation with its principal place of business and headquarters located at 10 Hudson Yards 347 10th Avenue New York, New York 10001 and

1   process may be served upon its registered agent, Corporation Service Company, 80
2   State Street, Albany, NY 12207.

3        6.      Defendant Soft Sheen-Carson LLC, is, and at all times relevant to this
4   action was, a limited liability company with its principal place of business and
5   headquarters located at 80 State Street, Albany, NY 12207 and process may be
6   served upon its registered agent, Corporation Service Company, 80 State Street,
7   Albany, NY 12207.

8        7.      Defendant Soft Sheen Products, Inc., is, and at all times relevant to this
9   action was, a corporation incorporated in Delaware and process may be served upon
10  its registered agent, Corporation Service Company, 251 Little Falls Drive,
11  Wilmington, DE 19808.

12       8.      Defendant DermoViva Skin Essentials Inc., is, and at all times relevant
13  to this action was, a corporation and process may be served upon its registered
14  agent, Corporate Services Company 251 Little Falls Drive, Wilmington, Delaware
15  19808.

16       9.      Defendant Dabur International Ltd., is, and at all times relevant to this
17  action was, a corporation with its principal place of business and headquarters
18  located at 5 Independence Way, Princeton, New Jersey 08540.

19       10.     Defendant Namaste Laboratories, LLC is, and at all times relevant to
20  this action was, a limited liability company with its principal place of business
21  located at 310 S. Racine, 8th Fl., South, Chicago, Illinois 60607, and process may
22  be served upon its registered agent, Illinois Corporation Service Company, 801
23  Adlai Stevenson Drive, Springfield, Illinois 62703.

24       11.     Defendant Strength of Nature, LLC is, and at all times relevant to this
25  action was, a limited liability company with its principal place of business and
26  headquarters located at 64 Ross Road, Savannah, Georgia 31405, and process may
27  be served upon its registered agent, Karan Sood, 6355 Peachtree Dunwoody Road,
28  Atlanta, Georgia 30328.

12. Defendant Godrej SON Holdings, Inc. is, and at all times relevant to this action was, a corporation with its principal place of business and headquarters located at 64 Ross Road, Savannah, Georgia 31405, and process may be served upon its registered agent, Karan Sood, 64 Ross Road, Savannah, Georgia 31405.

13. At all pertinent times, all Defendants were engaged in the research, development, manufacture, design, testing, sale, and marketing of the Products, and introduced such products into interstate commerce with knowledge and intent that such products would be sold in the State of Illinois.

14. At all times material hereto, Defendants developed, tested, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the defective Products, including but not limited to:

        a.     Dark & Lovely;

        b.     ORS Olive Oil Relaxer;

        c.     Just for Me; and

        d.     African Pride.

15. Defendants' defective Products were placed into the stream of interstate commerce and were used by the Plaintiff beginning in or around 1998, at the age of 14, until in or around 2019.

16. On or around December 12, 2016, Plaintiff had a miscarriage and was diagnosed with uterine cancer, conditions caused by Plaintiff's exposure to chemicals in the Defendants' Products.

## III.   JURISDICTION AND VENUE

17. This Court has subject-matter jurisdiction over this case under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000 and Plaintiff and Defendants are residents of different states.

18. This Court has personal jurisdiction over Defendants because Defendants conduct business in California, purposefully direct and/or directed their actions toward California, consented to being sued in California by registering an

agent for service of process in California, consensually submitted to the jurisdiction of California when obtaining a manufacturer or distributor license, and/or have the requisite minimum contacts with California necessary to constitutionally permit this Court to exercise jurisdiction. Moreover, Defendants' actions and/or inactions described herein were purposefully directed at and/or within the State of California, the damages were sustained by Plaintiffs within the State of California, and the damages sustained by Plaintiffs were a result of Defendants' actions and/or inactions—described herein—that were purposefully directed at and/or within the State of California. At all relevant times, Defendants expected or should have expected that their acts and omissions would have consequences within the United States and the State of California.

19.     Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this District and Plaintiff resides in this District.

## IV.     FACTS COMMON TO ALL COUNTS

### A.     Hair Straighteners and Relaxers

#### 1.     Market for Hair Straightening and Relaxing Products

20.     While Black people comprise about 13 percent of the U.S. population, it is estimated that they account for as much as 22 percent of the $42 billion-a-year personal care products market.[1]

21.     In 2020, the global Black Hair care market was estimated at $2.5 billion, with the hair relaxer market alone estimated at $718 million in 2021, with the expectation of growth to $854 million annually by 2028.

---

[1] Thandisizwe Chimurenga, How Toxic is Black Hair Care?, New America Media, Feb. 2, 2012, americamedia.org/2012/02/skin-deep-in-more-ways-than-one.php; Personal Care Products Manufacturing Industry Profile, Dun & Bradstreet First Research, August 2016, www.firstresearch.com/Industry-Research/Personal-Care-Products-Manufacturing.html (This report uses "Black" to describe not only people who identify as African-American, but Black people in the U.S. who come from the Caribbean or other areas. "African-American" is used only when a cited source specifies that term).

22.     In an analysis of ingredients in 1,177 beauty and personal care products marketed to Black women, the non-partisan Environmental Working Group (EWG) found that one in twelve ingredients was ranked highly hazardous on the scoring system of EWG's Skin Deep® Cosmetics Database, a resource for finding less-hazardous alternatives to personal care products. EWG determined that hair relaxers were among the worst-scoring products.

**2.      History of Hair Relaxers in America**

23.     In its natural or untreated state, Black or "afro-textured" hair is characterized by coils, zigzag and s-curve curl patterns; as well as by its density, fullness, texture, and feel.[2]

24.     Afro-textured hair "naturally grows up and out."[3]

25.     In Africa, hair was seen as a source of personal and spiritual power. As the highest point of the body and "most elevated part of the body, some communities believe[d] [their hair] connected them with the divine."[4] For some, hair was the "conduit for spiritual interaction with God."[5]

26.     African hairstyles were also status symbols reflecting one's "marital status, age, religion, and rank in society" and one's tribe.[6] Warriors, kings, and queens wore braids to show their ranking in society.[7] The Wolof tribe in West Africa wore braided styles when they went to war.[8]

---

[2] Patrick Obukowcho, Hair Relaxers: Science, Design, and Application, 26, 14 (2018).
[3] Ayana Byrd & Lori Tharps, When Black Hair Is Against the Rules, The New York Times, April 30, 2014, https://www.nytimes.com/2014/05/01/opinion/when-black-hair-is-against-the-rules.html.
[4] Nikki Fox, 6 Things Everyone Should Know About Black Hair History, Odele, Feb., 22, 2021. https://odelebeauty.com/blogs/the-rinse/black-hair-history-facts.
[5] Rumeana Jahangir, How Does Black Hair Reflect Black History?, BBC News. May 31, 2015. https://www.bbc.com/news/uk-england-merseyside-31438273.amp.
[6] History of Braids: More Than Just a Hairstyle, Genesis Career College, https://www.genesiscareer.edu/history-of-braids-more-than-just-a-hairstyle/.
[7] *Id.*
[8] *Id.*

27.     Most styling was extremely intricate and involved days of labor. It was expected that everyone would engage in this process as "only the mad and mourning did not do their hair."[9]

28.     One of the first things slave masters did to enslaved people forced to American soil was cut their hair. This was a way to "break their spirit and make slaves easier to control."[10] What was once a symbol of pride and symbolism became a tool for subordination and degradation. As such, hair cutting was also a common form of punishment.

29.     The very nature of slavery involved hard labor over long hours in dire conditions. Enslaved people had "no time to care about one's appearance or one's hair."[11] "Hair that was once a source of pride and expression of identity was often tucked away beneath cloth to cover rough, tangled tresses and shield them from hours spent toiling under the sun."[12] The hair that was once an important spiritual and cultural symbol became tangled and matted.

30.     White Americans did not see African or Black hair as beautiful. Instead they described it as "closer to sheep wool than human hair."[13] African hair that was once considered an attractive feature became a source of shame, to be covered or cut.

---

[9] Hlonipha Mokoena, From Slavery to Colonialism and School Rules, Navigating the History of Myths about Black Hair, Quartz Africa, Fe., 24, 2018, https://qz.com/africa/1215070/black-hair-myths-from-slavery-to-colonialism-school-rules-and-good-hair/.

[10] Brenda A. Randle, I Am Not My Hair, Race, Gender and Class, Volume 22, Number 1-2, 114 – 121 (2015).

[11] Nikki Fox, 6 Things Everyone Should Know About Black Hair History, Odele, Feb., 22, 2021. https://odelebeauty.com/blogs/the-rinse/black-hair-history-facts.

[12] *Id.*

[13] Ayana Byrd & Lori Tharps, When Black Hair Is Against the Rules, The New York Times, April 30, 2014. https://www.nytimes.com/2014/05/01/opinion/when-black-hair-is-against-the-rules.html

2735069.3

COMPLAINT

1    31.    In 1786, the Governor of Louisiana, Don Esteban Miro, passed the

2    "Tignon Law" requiring Black women to wear a tignon (scarf) over their hair as a

3    way of signifying they were members of the slave class, even if they were free.[14]

4    32.    "By requiring free Black women to wear the same hair covering, the

5    governor was marking them as related to enslaved women rather than white

6    women."[15]

7    33.    This law sent a direct signal to Black people that their hair held a

8    symbol of inequality and was a sign of poverty regardless of their actual social

9    status.

10   34.    Because afro-textured hair was kinky and reflected African heritage

11   rather than European ancestry, afro-textured hair was a symbol of low social

12   status.[16]

13   35.    Enslaved people with lighter skin and less-coiled hair were favored to

14   work in the slave master's residence, a far less strenuous position than outside labor

15   and in the plantation fields.[17]

16   36.    Texturism, the idea that "good hair" is equated with a straighter hair

17   texture, was cemented into American culture during the period of chattel slavery.

18   "Eurocentric beauty standards dictated that coily hair and dark skin were

19   unattractive and inferior"; "lighter skinned and straighter haired slaves were

20   favored and selected for more desirable positions in the house" as opposed to the

21   fields.[18] Thus, "the texture of an enslaved person's hair could determine their value

22   and working conditions, which in turn might impact their overall health, comfort

23

24   _____

[14] Nikki Fox, 6 Things Everyone Should Know About Black Hair History, Odele, Feb., 22, 2021, https://odelebeauty.com/blogs/the-rinse/black-hair-history-facts.

25   [15] Fashionable Rebellion, Women and the American Story, New York Historical Society Museum and Library, https://wams.nyhistory.org/settler-colonialism-and-

26   revolution/settler-colonialism/fashionable-rebellion/.

27   [16] Brenda A. Randle, I Am Not My Hair, Race, Gender and Class, Volume 22, Number 1-2, 114 – 121 (2015).

28   [17] *Id.*

[18] *Id.*

and chances for freedom[.]"[19] Naturally, Black men and women strived for a better life in the Americas and were taught that the straighter and less kinky their hair was, the better a life they could have. This fueled the desire for tools and products that could straighten Black hair texture.

37.    The institution of slavery destroyed enjoyment in and pride for African hairstyles. "The goal of grooming the hair had morphed from the elaborate and symbolic designs of Africa into an imitation of White styles adapted to Black kinks and curls."[20]

38.    Post emancipation stereotypes also ensured black subservience centered around depicting black hair in its natural state as the antithesis of feminine beauty.  The prominent 20th century images of Topsy, Picanninny, and Mammy are caricature depictions of black girls and women with unkempt hair unless totally covered by handkerchiefs. This was the public image of black femininity for a century after slavery that ensured that black hair in its natural state was perceived as uncivilised and animalistic.

39.    After centuries of enslavement Black women and girls began adapting to these European beauty standards because market realities and popular messaging compelled them to believe that lighter skin and straight hair, would increase their social and economic status.  Many black people would go to "dangerous lengths to straighten their hair."[21]

40.    Black or afro-textured hair can be manipulated into a straightened state with the use of hair tools and hair products, but hair—like skin tone—is immutable because of the hair follicle.  Extreme chemicals can temporarily change the follicle

---

[19] *Id.*

[20] Brenda A. Randle, I Am Not My Hair, Race, Gender and Class, Volume 22, Number 1-2, 114 – 121 (2015).

[21] Nikki Fox, 6 Things Everyone Should Know About Black Hair History, Odele, Feb., 22, 2021. https://odelebeauty.com/blogs/the-rinse/black-hair-history-facts.

output but not the follicle shape, and consequently the change is ephemeral and short lived.

41.     Prior to the invention of the chemical relaxer in 1900s, individuals would "press" afro-textured hair with metal hair tools such as the "hot comb." Pressing combs or hot combs are metal hair tools that are first heated in a stove or ceramic heater, then pressed into hair strands to temporarily straighten them.[22]

42.     The hot comb was first invented by a Frenchman, Marcel Grateau who popularized the hair styling tool in Europe in the 1870s, including through advertisements in catalogs of major department stores like Sears and Bloomingdales.[23] The hot comb was later modified by Madam C.J. Walker, a trailblazer in the development of black hair products, to be manufactured with wider comb teeth.[24] With Walker's system, once the comb was heated a softening ointment was then applied for easier manipulation of black hair.[25]

43.     Today, afro-textured hair is still often straightened with a hot comb rather than with chemicals. However, pressed hair remains susceptible to "shrinkage." Shrinkage is the process by which curly-kinky hair that has been temporarily straightened coils back into its natural state once the hair interacts with water, humidity, or perspiration[26], creating a shorter or fuller appearance.

---

[22] Jaclyn Peterson, The Price of Beauty, CTI Charlotte Teachers Institute Curriculum (2021).
[23] Henry Louis Gates, Madam Walker, the First Black American Woman to Be a Self-Made Millionaire, PBS 100 Amazing Facts About the Negro, https://www.pbs.org/wnet/african-americans-many-rivers-to-cross/history/100-amazing-facts/madam-walker-the-first-black-american-woman-to-be-a-self-made-millionaire/ (last visited October 18, 2022).
[24] Cookie Lommel, Madam C.J. Walker 60 (1993).
[25] Id. at 62.
[26] Id.

COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17



18    ### b.     The Invention of the Chemical Relaxer

19          44.     African American inventor Garrett Augustus Morgan discovered and

20    created a system that would permanently straighten afro-textured hair, eliminating

21    the issue of "shrinkage."

22          45.     In additional to being an inventor, Morgan was a tailor. In the early

23    1900s, Morgan was repairing his sewing machines and creating a way to polish the

24    needles to stitch fabrics more smoothly.[27] He applied a chemical solution to the

25    needles and wiped the solution off with a rag, and later noticed that the "curly"

26    fibers in the rag were straightened after exposure to the chemical.[28]

27

28    [27] Patrick Obukowcho, Hair Relaxers: Science, Design, and Application 27 (2018).
      [28] Mary N. Oluonye, Garrett Augustus Morgan: Businessman, Inventor, Good

46.    Morgan further tested the chemical on a dog with curly hair and eventually on his own hair. The chemical solution successfully straightened curly hair. He turned his formula into a gel-hair product, creating the G.A. Morgan Hair Refining Cream which was marketed in 1913.





Citizen 28 (2008).

47.     Morgan's invention paved the way for the alkaline relaxer and, later, the development of additional chemical-based permanent hair straightening products in the Black hair care market.[29]

### 3.     Defendants' Marketing Efforts

48.     In 1971, Dark and Lovely manufactured the first lye relaxer. The formula consisted of sodium hydroxide, water, petroleum jelly, mineral oils, and emulsifiers.[30]

49.     In the 1970s, lye relaxer users and manufacturers noticed that the lye formula stripped proteins from the hair strand, resulting in the hair thinning and breaking.[31] As a result, Johnson and Johnson marketed the first "gentle" hair relaxer in 1981, which instead used chemicals such as potassium hydroxide and lithium hydroxide.[32]

50.     Over time, Soft & Beautiful and other chemical relaxer manufacturers developed herbal and botanical hair relaxer formulas.[33]

51.     Today, hair relaxer products are marketed to African American customers across the United States, and the world, reinforcing the same historical Eurocentric standards of beauty. Defendants' marketing scheme relies heavily on branding and slogans that reinforce straight hair as the standard.[34]

52.     Defendant Strength of Nature markets its Soft & Beautiful and Motions relaxer products, depicting beautiful, happy, light-skinned African American women with straight hair in seemingly perpetual motion.[35]

---

[29] Patrick Obukowcho, Hair Relaxers: Science, Design, and Application 27 (2018).
[30] Cicely A. Richard, This History of Hair Relaxers, September 29, 2017 https://classroom.synonym.com/the-history-of-hair-relaxers-12078983.html.
[31] *Id.*
[32] *Id.*
[33] *Id.*
[34] *Id.*
[35] *Id.*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28





53.     Defendant Strength of Nature, LLC also carries a TCB Naturals line that promises "silky smooth relaxed hair"

54.     Defendant Strength of Nature, LLC's Just for Me brand specifically targets young Black girls with promises of "perfect straightness," grooming the next generation of lifetime consumers of relaxers containing DEHP.

2735069.3                                                                                                    COMPLAINT

1
2
3
4
5
6
7
8
9



10   55.   Defendant Godrej targets women with its African Pride relaxer that
11   promises to strengthen, protect, and nourish hair.

12
13
14
15
16
17
18
19
20
21



22   56.   Defendant Namaste also targets young Black girls with its Olive Oil
23   Girls line.

24
25
26
27
28

1
2
3
4
5
6
7
8
9
10
11



12    57.    Finally, Defendant L'Oréal depicts a Black woman with straight hair

13 on each of its Dark and Lovely and Optimum brands of relaxer product.

14
15
16
17



18
19
20
21
22
23
24
25
26
27
28

1
2
3
4
5
6
7
8
9
10



11        **4.      <u>Chemical Relaxer Use</u>**

12        58.     Hair relaxers are classified as creams or lotions which are specifically

13  marketed to Black and Brown women to "tame" their ethnic hair by making it

14  smoother, straighter, and easier to manage on a daily basis.

15        59.     Hair relaxing, or lanthionization, can be performed by a professional

16  cosmetologist in a salon or barbershop, or at home with at-home relaxer kits

17  designed for individual use. These home kits are sold in grocery, drug, and beauty

18  supply stores in urban and rural cities throughout the United States.

19        60.     Relaxers are applied to the base of the hair shaft and left in place for a

20  "cooking" interval, during which the relaxer alters the hair's texture by

21  purposefully damaging the hair's natural protein structure. The effect of this protein

22  damage straightens and smooths the hair. After a period of weeks (4 – 8 weeks on

23  average), depending on the hair's natural growth rate, the treated portion of the hair

24  grows away from the scalp as new growth sprouts from the roots, requiring

25  additional relaxer treatment to smooth the roots. These additional treatments are

26  colloquially referred as "re-touches" and "touch-ups", resulting in women relaxing

27  their new growth every four to eight weeks on average, usually for decades.

28

61.     Hair relaxers can, and often do, cause burns and lesions in the scalp, facilitating entry of hair relaxer constituents into the body. The main ingredient of ''lye'' relaxers is sodium hydroxide; no-lye relaxers contain calcium hydroxide and guanidine carbonate, and "thio" relaxers contain thioglycolic acid salts. No-lye relaxers are advertised to cause fewer scalp lesions and burns than lye relaxers, but there is little evidence to support this claim.

62.     In some studies, up to 90% of Black women have used hair relaxants and straighteners, which is more commonplace for these women than it is for any other race. Hair products such as relaxers contain hormonally active and carcinogenic compounds, such as phthalates, known to cause endocrine disruption, which are not required to be listed separately as ingredients and are often broadly lumped into the "fragrance" or "perfume" categories. Relaxer habits usually begin in formative childhood years, and adolescence is likely a period of enhanced susceptibility to debilitating conditions resulting from exposure to these chemicals.[36]

63.     In the 1990s, the first relaxer product for young Black girls, Just for Me, hit the market with a catchy advertising jingle that captured consumer attention.[37] It soon became one of the most popular straightening treatments, touting a no-lye formula designed to be gentler for children's sensitive scalps. Once relaxer use begins in childhood, it often becomes a lifetime habit.

64.     But relaxer use is often painful, and the impacts can be long-lasting. Scalp burns, which can be frequent with relaxer application, can increase the risk of permanent and debilitating diseases associated with long-term exposure to endocrine-disrupting chemicals. Black women with natural hairstyles, such as curly afros, braids or twists, are often perceived as less professional than Black women

---

[36] Patrick Obukowcho, Hair Relaxers: Science, Design, and Application 27 (2018).
[37] Dana Oliver, The '90s Just For Me Hair Relaxer Commercials Song Is Stuck In Our Heads, HuffPost, Feb., 1, 2014. https://www.huffpost.com/entry/just-for-me-hair-relaxer-commercial-song_n_4689981.

with straightened hair, particularly in industries where norms dictate a more conservative appearance.[38]

65.     Black women's use of, and dependence upon, hair straightening products are associated with numerous societal factors, including (1) the legacy of slavery and internalization of acceptable beauty norms, (2) media and advertisements, and (3) assimilation and economic security, among others.[39]

66.     In a culture which devalues the beauty of Black women, Black women understandably have internalized messages that their natural hair must be altered to be socially sanctioned and that they must alter their hair as a protective mechanism against racial discrimination.  The classification of hair as "good" Black hair is popularly categorized as "bad" or "good" based on the kinkiness of the hair texture and the hair texture's proximity to white-identified hair texture.  In the Dove CROWN Study for girls (2021) conducted by JOY Collective, the following statistics were discovered:[40]

a.      100% of Black elementary school girls in majority-white schools who report experiencing hair discrimination state they experience the discrimination by the age of ten (10).

b.      86% of Black teens who experience discrimination state they have experienced discrimination based on their hair by the age of twelve (12).[41]

---

[38] Christy Zhou Koval and Ashleigh Shelby Rosette,The Natural Hair Bias in Job Recruitment, Social Psychology and Personality Science, Volume 12, Issue 5, https://www.fuqua.duke.edu/duke-fuqua-insights/ashleigh-rosette-research-suggests-bias-against-natural-hair-limits-job

[39] Chanel Donaldson, Hair Alteration Practices Amongst Black Women and the Assumption of Self-Hatred, Applied Psychology Opus, https://wp.nyu.edu/steinhardt-appsych_opus/hair-alteration-practices-amongst-black-women-and-the-assumption-of-self-hatred/.

[40] The CROWN Act was created in 2019 by Dove and the CROWN Coalition, in partnership with then State Senator Holly J. Mitchell of California, to ensure protection against discrimination based on race-based hairstyles by extending statutory protection to hair texture and protective styles such as braids, locks, twists, and knots in the workplace and public schools. https://www.thecrownact.com/

[41] Black students are three to six times more likely to be suspended or expelled from school, and today, there remains a regressive movement that continues to

1    Additionally, Black students are three to six times more likely to be suspended or

2    expelled from school, and today, there remains a regressive movement that

3    continues to criminalize natural Black hairstyles under the auspices of "preparing

4    them for the real world." Discretionary school suspensions, particularly related to

5    Black hairstyles are disproportionately applied.[42]

6            c.      66% of Black girls in majority-white schools report

7    experiencing hair discrimination compared to 45% of Black girls in all school

8    environments.

9            d.      53% of Black mothers, whose daughters have experienced hair

10   discrimination, say their daughters experienced the discrimination as early as five

11   (5) years old.

12           e.      47% of Black mothers report having experienced discrimination

13   related to their hair.

14           f.      Trauma from these experiences cause girls to miss days from

15   school; Black teenage girls are missing a week of school per year due to hair

16   dissatisfaction.

17           g.      While 90% of Black girls report believing their hair is beautiful,

18   they are still subject to microaggressions and discrimination that have an impact on

19   self-esteem.

20           h.      Black women are 1.5 times more likely to be sent home from the

21   workplace because of their hair.

22

23

24

25   criminalize natural Black hairstyles under the auspices of "preparing them for the
     real world." Discretionary school suspensions, particularly related to Black

26   hairstyles are disproportionately applied.
     [42] Howard Henderson and Jennifer Wyatt Bourgeois, Penalizing black hair in the

27   name of academic success is racist, unfounded, and against the law, Feb. 21, 2021,
     Brookings, https://www.brookings.edu/blog/how-we-rise/2021/02/23/penalizing-

28   black-hair-in-the-name-of-academic-success-is-undeniably-racist-unfounded-and-
     against-the.law.

i.    Black women are 89% more likely than white women to agree with this statement, "I have to change my hair from its natural state to fit in at the office."

**5.    Regulatory Framework**

67.    The law does not require cosmetic products and ingredients, other than color additives, to have FDA approval before they go to market. But there are laws and regulations that apply to cosmetics placed into the market. The two most important laws pertaining to cosmetics marketed in the United States are the Federal Food Drug and Cosmetic Ace ("FD&C Act") and the Fair Packaging and Labeling Act ("FPLA").

68.    The FD&C Act expressly prohibits the marketing of "adulterated" or "misbranded" cosmetics in interstate commerce.

69.    Adulteration refers to a violation involving product composition, whether it results from ingredients, contaminants, processing, packaging, shipping or handling.

70.    Under the FD&C Act a cosmetic is adulterated if: (1) it bears or contains any poisonous or deleterious substance causing injury to the product user and (2) if its container is composed in whole or in part, of any poisonous or deleterious substance which may render the contents injurious to health.

71.    Misbranding refers to violations involving improperly labeled or deceptively packaged products.

72.    Under the FD&C Act, a cosmetic is misbranded if (1) labeling is false or misleading, (2) the label does not include all required information, (3) required information is not prominent and conspicuous, (4) the packaging and labeling is in violation of an applicable regulation issued pursuant to section 3 and 4 of the Poison Prevention Packaging Act of 1970.[43]

---

[43] Food and Drug Administration Cosmetic Act § 602 (1938).

73.     Under U.S. law, cosmetic manufacturers are not required to submit their safety data to the FDA. However, it is against the law to put an ingredient in a cosmetic that makes the cosmetic harmful when used as intended.[44] An example is methylene chloride, because it causes cancer in animals and is likely to be harmful to human health, too.[45]

74.     On May 19, 2022, the FDA issued a rule to amend its food additive regulations to no longer provide for most previously-authorized phthalates to be used as food additives because these uses have been abandoned by the industry.[46] The FDA revoked authorizations for the food contact use of 23 phthalates and 2 other substances used as plasticizers, adhesives, defoaming agents, lubricants, resins, and slimicides.[47]

75.     Companies and/or individuals who manufacture or market cosmetics have a legal responsibility and duty to ensure the safety of their own products. Neither the law nor FDA regulations require specific tests to demonstrate the safety of individual products or ingredients, and the law also does not require cosmetic companies to share their safety information with the FDA.

76.     The FDA has consistently advised manufacturers to use whatever testing is necessary to ensure the safety of products and ingredients, which may be substantiated through (a) reliance on already available toxicological test data on individual ingredients and on product formulations that are similar in composition to the particular cosmetic and (b) performance of any additional toxicological and other tests that are appropriate in light of such existing data and information.[48]

---

[44] Prohibited & Restricted Ingredients in Cosmetics, U.S. Food and Drug Administration, https://www.fda.gov/cosmetics/cosmetics-laws-regulations/prohibited-restricted-ingredients-cosmetics.
[45] 21 Code of Federal Regulations § 700.19.
[46] § 87 FR 31080.
[47] Phthalates in Food Packages and Food Contact Applications, U.S. Food and Drug Administration, https://www.fda.gov/food/food-ingredients-packaging/phthalates-food-packaging-and-food-contact-applications.
[48] FDA Authority Over Cosmetics: How Cosmetics Are Not FDA-Approved, but Are FDA-Regulated, U.S. Food and Drug Administration, Mar., 3, 2005,

77.     Except for color additives and ingredients prohibited or restricted by regulation, a manufacturer may use any ingredient in the formulation of a cosmetic, provided that (1) the ingredient and the finished cosmetic are safe under labeled or customary conditions of use, (2) the product is properly labeled, and (3) the use of the ingredient does not otherwise cause the cosmetic to be adulterated or misbranded under the laws the FDA enforces.[49]

78.     With respect to whether the product is properly labeled, Title 21 of the Code of Federal Regulations defines the establishment of warning statements related to cosmetic products. Section 740.1 states that "[t]he label of a cosmetic product shall bear a warning statement whenever necessary or appropriate to prevent a health hazard that may be associated with the product."  As a result, manufacturers have a responsibility to ensure their own cosmetic products are safe under labeled or customary conditions of use, and that they are properly labeled and not adulterated or misbranded under FDA laws.

79.     In short, under the current regulatory framework in the United States, it is incumbent upon the manufacturers of cosmetic products, and them alone, to assess the safety and efficacy of their products, and to warn consumers anytime a health hazard may be associated with their products. Here, a wealth of scientific information is available regarding long-term use of hair relaxers, straighteners, and hair dyes as containing certain endocrine-disrupting chemicals, which should have alerted manufacturers of these products to the specific and dangerous harms associated with their products when used as intended, particularly by Black women and girls to which they were specifically marketed.

---

https://www.fda.gov/cosmetics/cosmetics-laws-regulations/fda-authority-over-cosmetics-how-cosmetics-are-not-fda-approved-are-fda-regulated.
[49] *Id.*

1

### 6.    Endocrine-Disrupting Chemicals

80.    The endocrine system is indispensable for life and influences nearly every cell, organ, and process within the body.[50] The endocrine system regulates all biological processes in the body from conception through adulthood, including the development of the brain and nervous system, the growth and function of the reproductive system, as well as the metabolism and blood sugar levels.[51]

81.    The endocrine system is a tightly regulated network of glands that produce and release precise amounts of hormones that bind to receptors located on specific target cells throughout the body.[52]

82.    Hormones, such as estrogen, testosterone, progesterone, and androgen, are chemical signals that control or regulate critical biological processes.[53]

83.    When a hormone binds to a target cell's receptor, the receptor carries out the hormone's instructions (*i.e.*, the stimulus) and either switches on or switches off specific biological processes in cells, tissues, and organs.[54]

84.    The precise functioning of the endocrine system is vital to maintain hormonal homeostasis, the body's natural hormonal production and degradation. A slight variation in hormone levels can lead to significant adverse health effects, including reproductive impairment and infertility, cancer, cognitive deficits, immune disorders, and metabolic syndrome.[55]

85.    Endocrine disrupting chemicals ("EDCs") are chemicals, or chemical mixtures, that interfere with the normal activity of the endocrine system.

---

[50] Endocrine System: The Endocrine System Includes The Thyroid, Adrenals, and the Pituitary Gland, Science Direct, https://www.sciencedirect.com/topics/psychology/endocrine-system.
[51] Endocrine Disruption, United States Environmental Protection Agency, Mar., 7, 2022, https://www.epa.gov/endocrine-disruption/what-endocrine-system.
[52] *Id.*
[53] *Id.*
[54] *Id.*
[55] *Id.*; Michele La Merrill, *et al.*, Consensus on the Key Characteristics of Endocrine-Disrupting Chemicals as a Basis for Hazard Identification, Nature Reviews Endocrinol, Nov., 12, 2019, https://www.nature.com/articles/s41574-019-0273-8

86.     EDCs can act directly on hormone receptors as mimics or antagonists, or on proteins that control hormone delivery.[56]

87.     EDCs disrupt the endocrine system and interfere with the body's hormonal homeostasis in various ways.

88.     EDCs can cause the body to operate as if there were a proliferation of a hormone, and thus over-respond to the stimulus or respond when it was not supposed to by mimicking a natural hormone.

89.     EDCs can increase or decrease the levels of the body's hormones by affecting the production, degradation, and storage of hormones.

90.     EDCs can block the hormone's stimulus by inducing epigenetic changes, modifications to DNA that regulate whether genes are turned on or off or altering the structure of target cells' receptors.[57]

91.     EDCs are known to cause numerous adverse human health outcomes including endometriosis, abnormalities in reproductive organs, various cancers, altered nervous system and immune function, respiratory problems, metabolic issues, diabetes, obesity, cardiovascular problems, growth, and neurological and learning disabilities.[58]

92.     EDCs that mimic the effects of estrogen in the body may contribute to disease risk because exposure to estrogen, endogenously and exogenously, is associated with breast cancer, and a woman's lifetime risk of developing the disease increases with greater duration and cumulative exposure.

---

[56] Evanthia Diamanti-Kandarakis, *et al.*, Endocrine-Disrupting Chemicals: An Endocrine Society Scientific Statement, Endocrine Reviews, June 30, 2009, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2726844/.

[57] Luis Daniel Martínez-Razo, *et al.*, The impact of Di-(2-ethylhexyl) Phthalate and Mono(2-ethylhexyl) Phthalate in placental development, function, and pathophysiology, Environment International, January 2021, https://www.sciencedirect.com/science/article/pii/S0160412020321838?via%3Dihub.

[58] Endocrine Disrupting Chemicals (EDCs), Endocrine Society, Jan., 24, 2022, https://www.endocrine.org/patient-engagement/endocrine-library/edcs#:~:text=EDCs%20can%20disrupt%20many%20different,%2C%20certain%20cancers%2C%20respiratory%20problems%2C.

93.     Natural and synthetic EDCs are present in hair products under the guise of "fragrance" and "perfumes," and thus enter the body when these products are exogenously applied to the hair and scalp. Studies exploring this issue have thus far classified EDCs as estrogens, phthalates, and parabens.

94.     Indeed, numerous studies spanning more than two decades have demonstrated the adverse impact that EDCs, including Di-2-ethylhexylphthalate, have on the male and female reproductive systems. These impacts include inducing endometriosis, abnormal reproductive tract formation, pregnancy loss, and abnormal puberty onset.[59]

### 7.     Phthalates

95.     Phthalates are used in a variety of cosmetics and personal care products. Phthalates are chemical compounds developed in the last century that are used to make plastics more durable. These colorless, odorless, oily liquids also referred to as "plasticizers" based on their most common uses.

96.     Phthalates also function as solvents and stabilizers in perfumes and other fragrance preparations. Cosmetics that may contain phthalates include nail polishes, hair sprays, aftershave lotions, cleansers, and shampoos.

97.     At all relevant times herein, phthalates were used in Defendants' products.

98.     Phthalates are chemicals used to improve the stability and retention of fragrances and to help topical products stick to and penetrate skin and hair.[60]

99.     Phthalates are known EDCs which interfere with natural hormone production and degradation and are detrimental to human health.[61]

---

[59] Hee-Su Kim, *et al.*, Hershberger Assays for Di-2-ethylhexyl Phthalate and Its Substitute Candidates, Dev Reproduction, Mar. 22, 2018, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5915764/.
[60] Olivia Koski & Sheila Hu, Fighting Phthalates, National Resources Defense Council, April 20, 2022, https://www.nrdc.org/stories/fighting-phthalates.
[61] Yufei Wang & Haifeng Qian, Phthalates and Their Impacts on Human Health, Healthcare (Basel) 9, 603, May 9, 2021, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8157593/.

2735069.3                                                                    COMPLAINT

1    100.   Phthalates are commonly used by cosmetics and hair care product

2    manufacturers to make fragrances and colors last longer, and to make hair more

3    flexible after product is applied, among other uses.

4    101.   Phthalates can be found in most products that have contact with

5    plastics during producing, packaging, or delivering. Despite the short half-lives in

6    tissues, chronic exposure to phthalates will adversely influence the endocrine

7    system and the functioning of multiple organs, which has negative long-term

8    impacts on the success of pregnancy, child growth and development, and

9    reproductive systems in both young children and adolescents. Several countries

10   have established restrictions and regulations on some types of phthalates.[62]

11   102.   Phthalates are a series of chemical substances, which are mainly used

12   as plasticizers added to polyvinyl chloride ("PVC") plastics for softening effects.

13   Phthalates can potentially disrupt the endocrine system.[63]

14   103.   Defendants' products referenced herein contain phthalates, including

15   Di-2-ethylhexylphthalate.

16   104.   Under the authority of the Fair Packaging and Labeling Act ("FPLA"),

17   the FDA requires an ingredient declaration on cosmetic products sold at the retail

18   level to consumers.

19   105.   However, the regulations do not require the listing of the individual

20   fragrance or flavor, or their specific ingredients, meaning phthalates evade listing

21   when combined with a fragrance. As a result, consumers, such as Plaintiff, are not

22   able to determine from the ingredient declaration on the label if phthalates were

23   present in a fragrance used in the herein-referenced hair products used by the

24   Plaintiff and placed into the stream of commerce by Defendants.

25

26

27   _____

28   [62] *Id.*
     [63] *Id.*

COMPLAINT

106.   Since 1999, the Centers for Disease Control ("CDC") have found phthalates in individuals studied for chemical exposure.[64] Neither IARC nor NTP has evaluated DEHP with respect to human carcinogenicity.

### 8.   Di-2-ethylhexylphthalate

107.   Di-2-ethylhexylphthalate[65] ("DEHP") is a highly toxic manufactured chemical[66] that is not found naturally in the environment.[67]

108.   DEHP belongs to the family of chemicals called phthalates.[68]

109.   DEHP was first used in 1949 in United States and has been the most abundantly used phthalate derivative in the Twentieth century.[69]

110.   DEHP does not covalently bind to its parent material. Non-covalent bonds are weak and, as a result, DEHP readily leaches into the environment increasing human exposure.[70]

111.   Humans are exposed to DEHP through ingestion, inhalation, and dermal exposure for their lifetimes, including intrauterine life.[71]

---

[64] Biomarker Groups, National Report on Human Exposure to Environmental Chemicals, Center for Disease Control, https://www.cdc.gov/exposurereport/pdf/Biomarker_Groups_Infographic-508.pdf.

[65] Also known as Bis(2-ethylhexyl) phthalate.

[66] Sai Rowdhwal & Jiaxiang Chen, Toxic Effects of Di-2-ethylhexyl Phthalate: An Overview, Biomed Research International, Feb. 22, 2018 https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5842715/#:~:text=DEHP%20is%20noncovalently%20bound%20to,and%20plastic%20waste%20disposal%20sites.

[67] Toxicological Profile for Di(2-Ethylhexyl) Phthalate (DEHP), U.S. Dept of Health and Human Services, January 2022, https://www.atsdr.cdc.gov/ToxProfiles/tp9.pdf (DEHP is listed as hazardous pollutants under the Clean Air Act.; DEHP is on the Proposition 65 list because it can cause cancer and birth defects or other reproductive harm).

[68] Di(2-ethylhexyl) phthalate (DEHP), Proposition 65, California. Gov, https://www.p65warnings.ca.gov/fact-sheets/di2-ethylhexylphthalate-dehp.

[69] Pinar Erkekoglu & Belma Kocer-Gumusel, Environmental Effects of Endocrine-Disrupting Chemicals: A Special Focus on Phthalates and Bisphenol A, Environmental Health Risk, June 16, 2016, https://www.intechopen.com/chapters/50234.

[70] Katelyn H. Wong & Timur Durrani, Exposures to Endocrine Disrupting Chemicals in Consumer Products – A Guide for Pediatricians, Current Problems in Pediatric and Adolescent Health Care, Science Direct, May 2017, https://www.sciencedirect.com/science/article/pii/S1538544217300822?via%3Dihub.

[71] Schmidt, Juliane-Susanne, et al., Effects of Di(2-ethylhexyl) Phthalate (DEHP) on Female Fertility and Adipogenesis in C3H/N Mice, Environmental Health

112.   The Agency for Toxic Substances and Disease Registry ("ATSDR") estimates that the range of daily human exposure to DEHP is 3–30 µg/kg/day.[72]

113.   The no-observed-adverse-effect level for DEHP to humans is 4.8 mg/kg bodyweight/day and the tolerated daily intake (TDI) is 48 µg/kg bodyweight.[73]

| Endpoint | Cancer (NSRL) | | Developmental and Reproductive Toxicity (MADL) | |
|---|---|---|---|---|
| Route of Exposure | Oral | Inhalation | Oral | Inhalation |
| DEHP | 310 µg/day | N.C. | 410 µg/day | N.C. |
| Source: OEHHA's safe harbor levels for TDCIPP, DBP, DEHP, benzene, and formaldehyde. N.C. = not calculated by OEHHA as of August 2020.[74] | | | | |

114.   When DEHP enters in the human body, it breaks down into specific metabolites. The toxicity of DEHP is mainly attributed to its unique metabolites which include the primary metabolite, mono-(2-ethylhexyl)phthalate (MEHP), and secondary metabolites, mono-(2-ethyl-5-hydroxyhexyl)phthalate (MEHHP), and mono-(2-ethyl-5-oxohexyl)phthlate (MEOHP).[75]

---

Perspective, May 15, 2012, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3440070/.

[72] Hannon, Patrick *et al.*, Daily Exposure to Di(2-ethylhexyl) Phthalate Alters Estous Cyclicity and Accelerates Primordial Follicle Recruitment Potentially Via Dysregulation of the Phosphatidylinositol 3-Kinase Signaling Pathway in Adult Mice, Biology of Reproduction, Volume 90, Issue 6, June 2014, 136, 1–11 https://academic.oup.com/biolreprod/article/90/6/136,%201-11/2514356.

[73] Yufei Wang & Haifeng Qian, Phthalates and Their Impacts on Human Health, Healthcare (Basel) 9(5):603, May 18, 2021, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8157593/.

[74] Aalekhya Reddam & David Volz, Inhalation of two Prop 65-listed Chemicals Within Vehicles May Be Associated with Increased Cancer Risk, Environment International Volume 149, April 2021, https://www.sciencedirect.com/science/article/pii/S016041202100026X.

[75] Saab, Yolande, et. al., Risk Assessment of Phthalates and Their Metabolites in Hospitalized Patients: A Focus on Di- and Mono-(2-ethylhexyl) Phthalates Exposure from Intravenous Plastic Bags. Toxics, 10(7), 357, https://pubmed.ncbi.nlm.nih.gov/35878262/; Ishtaf Sheikh, *et al.*, Endocrine disruption: In silico perspectives of interactions of di-(2-ethylhexyl)phthalate and its five major metabolites with progesterone receptor. BMC Structural Biology Volume 16, Suppl 1, 16, Sept., 30, 2016,

115.   DEHP and its metabolites are known to cause significant adverse-health effects including but not limited to: endometriosis, developmental abnormalities, reproductive dysfunction and infertility,[76] various cancers, and metabolic syndrome within humans and their future children.[77]

116.   Most of the available studies on the health effects of DEHP on laboratory animals used oral administration, with a few inhalation studies and only two dermal exposure studies identified.[78]

117.   The results of the selected animal studies, along with limited human data, suggest potential associations between DEHP exposure and the following health outcomes:

a.   Reproductive effects. Epidemiological studies suggest a potential association between DEHP exposure and decreased serum testosterone and altered sperm parameters in males. Available studies on fertility effects in humans do not indicate an association between DEHP exposure and infertility. In animals, the available oral and inhalation studies provide evidence that the male reproductive system, particularly the testes, is susceptible to DEHP toxicity. Evidence from animal studies indicates decreased male and female fertility at high oral doses.

b.   Developmental effects. Epidemiological studies suggest a potential association between reduced AGD and testicular decent in male infants and prenatal DEHP exposure. In addition, human epidemiological studies provide

---

https://bmcstructbiol.biomedcentral.com/articles/10.1186/s12900-016-0066-4 (Other secondary metabolites include mono(2-ethyl-5-carboxypentyl)phthalate (5-cx-MEPP) and mono[2-(carboxymethyl)hexyl]phthalate (2-cx-MMHP)).

[76] Richardson, Kadeem et. al., Di(2-ethylhexyl) Phthalate (DEHP) Alters Proliferation and Uterine Gland Numbers in the Uterine of Adult Exposed Mice, Reproductive Toxicology, 77, 70-79, https://pubmed.ncbi.nlm.nih.gov/29458081/.

[77] Yufei Wang & Haifeng Qian, Phthalates and Their Impacts on Human Health, Healthcare (Basel) 9, 603, May 9, 2021, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8157593/.

[78] Chapter 2: Health Effects, Toxicological profile for Di(2-ethylhexyl) phthalate (DEHP) (2001), https://www.atsdr.cdc.gov/ToxProfiles/tp9-c2.pdf.

mixed results for potential relationships between exposure to DEHP and preterm birth, early puberty, and delayed mental and psychomotor development in children. Studies of animals indicate that altered glucose homeostasis and the development of the reproductive system following early life exposure is a particularly sensitive target of DEHP toxicity.

118.   The global consumption of DEHP was estimated at 3.07 million tons (global demand for plasticizers continues to rise). The estimated global market of phthalates in 2020 was expected to reach $10 billion USD and would still be widely used in plasticizers.[79]

119.   Human epidemiological studies have shown a significant association between phthalates exposures and adverse reproductive outcomes in both women and men.[80]

120.   Evidence found that DEHP was significantly related to insulin resistance and higher systolic blood pressure and problems with the reproduction system, including earlier menopause, low birth weights, pregnancy loss, and preterm births.[81]

121.   When it comes to the impacts on children, epidemiological studies about phthalates toxicity focused on pregnancy outcomes, genital development, semen quality, precocious puberty, thyroid function, respiratory symptoms, and neurodevelopment.[82]

122.   Since the turn of the century, restrictions on phthalates have been proposed in many Asian and Western countries. In 2008, the U.S. Congress announced the Consumer Protection Safety Act (CPSA) that permanently banned

---

[79] *Id.*

[80] *Id.*

[81] N.M. Grindler, *et al.*, Exposure to Phthalate, an Endocrine Disrupting Chemical, Alters the First Trimester Placental Methylome and Transcriptome in Women, Scientific Reports Volume 8, April 17, 2018, https://doi.org/10.1038/s41598-018-24505-w.

[82] *Id.*

products, especially children's toys and childcare articles, containing DEHP, DBP, and BBP at levels >0.1% by weight.[83]

### B.  Uterine Cancer Associated with Exposure to Endocrine Disrupting Chemicals

123.  Uterine cancer is associated with phthalate metabolites found in hair care products.

124.  Uterine cancer[84] is among the more common (the fourth most common) cancers in women in developed countries,[85] accounting for about 3% of all new cancer cases.[86]

125.  Every year, around 65,000 females develop uterine cancer in the U.S.A. alone, out of which more than 90% is of endometrial origin. It is commonly diagnosed in the seventh decade, with the mean age being 61 years.[87]

126.  The incidence in Black women is twice that of white women.[88] In addition, Black women with uterine cancer carry a poorer prognosis as compared to white women.[89]

127.  Though death rates from other cancers in women have declined in recent years, death rates for uterine cancer have increased by more than 100% in the last 20 years.[90]

---

[83] Consumer Product Safety Improvement Act of 2008, H.R. 4040, 110th Cong. (2008), https: //www.congress.gov/110/plaws/publ314/PLAW-110publ314.pdf.
[84] Otherwise known as endometrial carcinoma.
[85] Unaiza Faizan & Vijayadershan Muppidi, Uterine Cancer, In: StatPearls, National Library of Medicine, Jan 2022, https://www.ncbi.nlm.nih.gov/books/NBK562313/.
[86] Cancer Stat Facts: Uterine Cancer, National Cancer Institute, https://seer.cancer.gov/statfacts/html/corp.html
[87] *Id.*
[88] *Id.*
[89] Joel Sorosky, Endometrial Cancer, Obstetrics & Gynecology Volume 120, 383-97, Aug. 2012, https://pubmed.ncbi.nlm.nih.gov/22825101/.
[90] Linda Duska, *et al.*, Treatment of Older Women With Endometrial Cancer: Improving Outcomes With Personalized Care, American Society Clinical Oncology Educational Book, 35:164-74, 2016, https://pubmed.ncbi.nlm.nih.gov/27249697/.

128.   Indeed, new cases of uterine cancer have increased by 0.6 percent per year from 2010 to 2019, and death rates have risen an average of 1.7 percent per year during the same time frame.[91]

129.   A groundbreaking study recently found that women who use chemical hair straightening or relaxing products have a higher risk contracting of uterine cancer.[92]

130.   The study found that an estimated 1.64% of women who never used chemical hair straighteners or relaxers would go on to develop uterine cancer by the age of 70; but for frequent users, that risk more than doubles, increasing to 4.05%.[93]

131.   These risks are more substantial among Black women, who make up the overwhelming majority of customers for hair straightening and hair relaxing products, including Defendants' products.

### C.   Ms. Bryant's Use of Hair Relaxing Products

132.   Ms. Bryant was first exposed to EDCs and/or phthalate-based products around 1998, at or around the age of 14, when she began using Defendants' Products.

133.   Ms. Bryant used Defendants' Products by using the Products or having a professional at hair salon use the Products according to the Products' instructions.

134.   Ms. Bryant continued using the Products from 1998 to 2014 approximately twice a month.

135.   There was never any warning or labeling on the Products that normal use of the Products could cause her to develop cancer.

---

[91] 88 Jack J. Lee, Rising Endometrial Cancer Rate Spur New Approaches to Prevention, National Cancer Institute: Division of Cancer Prevention, June 28, 2022, https://prevention.cancer.gov/news-and-events/blog/rising-endometrial-cancer.

[92] 89 Che-Jung Chang, *et al.*, Use of Straighteners and Other Hair Products and Incident Uterine Cancer, Journal of the National Cancer Institute, Oct., 17, 2022, https://pubmed.ncbi.nlm.nih.gov/36245087/.

[93] *Id.*

2735069.3                                                            COMPLAINT

136.   Ms. Bryant was diagnosed with uterine cancer after a miscarriage she had on December 12, 2016 while in a hospital emergency room.

137.   Ms. Bryant required immediate medical attention to remove her fallopian tubes and the cancer to prevent the cancer from metastasizing.

138.   In January 2017 medical professionals at Barnes Jewish Hospital in Saint Louis, Missouri removed her fallopian tubes and the cancer.

139.   Ms. Bryant has had to have follow-up tests performed each year after the removal of her fallopian tubes and the cancer to ensure the cancer does not return.

140.   As a result of Defendants' acts and omissions, Ms. Bryant has suffered a miscarriage, extreme pain and suffering, extreme emotional distress, and monetary losses.

## V.   <u>TOLLING OF THE STATUTE OF LIMITATIONS</u>

### A.   <u>Fraudulent Concealment Tolling</u>

141.   Upon information and belief, Defendants have known or should have known that the Products cause ovarian and uterine cancer based on their manufacturing, marketing, testing, promoting, selling and/or distributing of the Products, knowledge of the ingredients contained in the Products, and the scientific knowledge available to the Defendants on the impact of hair relaxers. Instead of identifying and disclosing the adverse side effects of the Products, Defendants deliberately concealed the adverse side effects of the Products from the public.

142.   Defendants' knowledge and deliberate concealment toll any applicable statute of limitations.

### B.   <u>Estoppel</u>

143.   Defendants were and are under a continuous duty to disclose to Plaintiff the true character, quality, and nature of the Products for which it actively concealed—and continues to conceal—the adverse side effects and the true character, quality, and nature of the Products while knowingly making false

representations that describe the Products as protective, nourishing, and healthy. Plaintiffs reasonably relied upon Defendants' false representations and/or active concealment of these facts. Based on the foregoing, Defendants are estopped from relying on any statute of limitations in defense of this action.

**C.   Discovery Rule**

144.   The causes of action alleged herein did not accrue until Plaintiff discovered that the Product was defective.

145.   Plaintiff had no realistic ability to discern that the Products were defective until – at the earliest – after she was diagnosed with cancer.  Even then, Plaintiff had no reason to know that years of using Defendants' Products would cause cancer because of Defendants' deliberate concealments and misrepresentations about the true nature, character, and quality of the Products.  Not only did Defendants not warn Plaintiff that the Products caused adverse side effects, including cancer, Defendants falsely represented that the Products were protective, nourishing, and healthy.  Thus Plaintiff was not reasonably able to discover the adverse side effects of the Products until after years of purchasing and using the Products, despite using the Products as instructed, and her causes of action did not accrue until, at the earliest, she discovered that the Products had adverse side effects that caused cancer.

**COUNT ONE**
**STRICT LIABILITY**
**(FAILURE TO WARN)**

146.   Plaintiff repeats and realleges all allegations as if fully set forth herein.

147.   At all pertinent times, the Defendants were manufacturing, marketing, testing, promoting, selling and/or distributing the Products in the regular course of business.

148.   At all pertinent times, Plaintiff used the Products on her scalp area, which is a reasonably foreseeable use.

1    149.   At all pertinent times, Defendants in this action knew or should have

2 known that the use of phthalates and other EDC's in hair products significantly

3 increases the risk of cancer, based upon scientific knowledge.

4    150.   At all pertinent times, including the time of sale and consumption, the

5 Products, when put to the aforementioned reasonably foreseeable use, were in an

6 unreasonably dangerous and defective condition because they failed to contain

7 adequate and proper warnings and/or instructions regarding the increased risk of

8 cancer associated with the use of the Defendant's hair products. Defendants

9 themselves failed to properly and adequately warn and instruct Plaintiff as to the

10 risks and benefits of the Products given her need for this information.

11    151.   Had Plaintiff received a warning that the use of the Products would

12 significantly increase her risk of developing cancer, she would not have used them.

13 As a proximate result of Defendants' design, manufacture, marketing, sale, and

14 distribution of the Products, Plaintiff suffered injuries and damages including, but

15 not limited to, physical and mental pain and suffering, and medical expenses.

16    152.   The development of cancer by Plaintiff was the direct and proximate

17 result of the unreasonably dangerous and defective condition of the Products at the

18 time of sale and consumption, including their lack of warnings; Plaintiff suffered

19 injuries and damages including, but not limited to, physical and mental pain and

20 suffering, and medical expenses.

21    153.   Defendants' products were defective because they failed to contain

22 warnings and/or instructions, and breached express warranties and/or failed to

23 conform to express factual representations upon which Plaintiff justifiably relied in

24 electing to use the Products. The defect or defects made the Products unreasonably

25 dangerous to persons, such as Plaintiff, who could reasonably be expected to use

26 and rely upon such products. As a result, the defect or defects were a producing

27 cause of Plaintiff's injuries and damages.

28

2735069.3           COMPLAINT

154.   Defendants' products failed to contain, and to this day fail to contain, adequate warnings and/or instructions regarding the increased risk of developing cancer with the use of their products by women. Defendants continue to market, advertise, and expressly represent to the general public that it is safe for women to use their product. These Defendants continue with these marketing and advertising campaigns despite having scientific knowledge that dates back to 2011 that their products posed a risk to the reproductive health of women.

155.   Plaintiff sustained the following damages as a foreseeable, direct, and proximate result of Defendants' acts and/or omissions:

        a.   Economic losses including medical care and lost earnings; and

        b.   Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

**COUNT TWO**
**STRICT LIABILITY**
**(DESIGN AND/OR MANUFACTURING DEFECT)**

156.   Plaintiff repeats and realleges all allegations as if fully set forth herein.

157.   Defendants engaged in the design, development, manufacture, marketing, sale, and distribution of the Products in a defective and unreasonably dangerous condition to consumers, including Plaintiff.

158.   Defendants caused the Products to enter the stream of commerce and to be sold through various retailers, where Plaintiff purchased the Products.

159.   The Products were expected to, and did, reach consumers, including Plaintiff, without change in the condition in which it was manufactured and sold by Defendants and/or otherwise released into the stream of commerce.

160.   Plaintiff used the Products in a manner normally intended, recommended, promoted, and marketed by Defendants.

161.   Products failed to perform safely when used by Plaintiff in a reasonably foreseeable manner, specifically increasing her risk of developing uterine and ovarian cancer.

162.   The propensity of phthalates and other endocrine receptive chemicals to trigger cancerous growths in premenopausal women, including, but not limited to, the uterus, thereby substantially increasing the risk of cancer, including, but not limited to, uterine and ovarian cancer, renders the Products unreasonably dangerous when used in the manner it was intended and to an extent beyond what would be contemplated by the ordinary consumer.

163.   Importantly, the Products are an inessential cosmetic product that do not treat or cure any serious disease. Further, safer alternatives, including fragrance free products, have been readily available for decades.

164.   Defendants have known, or should have known, that the Products are unreasonably dangerous but have continued to design, manufacture, sell, distribute, market, promote, and supply the Products so as to maximize sales and profits at the expense of public health and safety, in conscious disregard of the foreseeable harm to the consuming public, including Plaintiff.

165.   As a direct and proximate result of Defendants' conduct, including actions, omissions, and misrepresentations, Plaintiff sustained the following damages:

a.   Economic losses including medical care and lost earnings; and

b.   Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

**COUNT THREE**
**NEGLIGENCE**
**(NEGLIGENT FAILURE TO WARN)**

166.   Plaintiff repeats and realleges all allegations as if fully set forth herein.

167.   At all relevant times. Defendants engaged in the design, development, manufacture, marketing, sale, and distribution of the Products in a defective and unreasonably dangerous condition to consumers, including Plaintiff.

168.   Defendants knew, or by the exercise of reasonable care, should have known, that use of their Products was dangerous, harmful, and injurious when used by Plaintiff in a reasonably foreseeable manner.

169.   Defendants knew, or by the exercise of reasonable care, should have known, that ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of their Products, and that Products were likely to increase the risks of cancerous growths in premenopausal women, including, but not limited to, the uterus, thereby substantially increasing the risk of cancer, including, but not limited to, uterine and ovarian cancer, when used in the manner it was intended and to an extent beyond that would be contemplated by the ordinary consumer.

170.   Defendants owed a duty to all reasonably foreseeable consumers to disclose the risks associated with the use of their Products.

171.   Defendants breached their duty of care by failing to use reasonable care in providing adequate warnings on their Products, including that Products were likely to increase the risks of cancerous growths in premenopausal women, including, but not limited to, the uterus, thereby substantially increasing the risk of cancer, including, but not limited to, uterine and ovarian cancer, when used in the manner it was intended and to an extent beyond what would be contemplated by the ordinary consumer.

172.   The failure of Defendants to adequately warn about their defective products, and their efforts to misleadingly advertise through conventional avenues, created a danger of injuries described herein that were reasonably foreseeable at the time of design and/or manufacture and distribution.

2735069.3

COMPLAINT

173.    At all relevant times, Defendants could have provided adequate warnings and instructions to prevent the harms and injuries set forth herein, such as providing full and accurate information about the products in advertising.

174.    A reasonable company under the same or similar circumstances would have warned and instructed of the dangers.

175.    Plaintiff was injured as a direct and proximate result of Defendants' failure to warn and instruct because she would not have used the Products had she received adequate warnings and instructions that the Products could increase the risks of cancerous growths in premenopausal women, including, but not limited to, the uterus, thereby substantially increasing the risk of cancer, including, but not limited to, uterine and ovarian cancer, when used in the manner it was intended and to an extent beyond what would be contemplated by the ordinary consumer.

176.    Defendants' lack of adequate and sufficient warnings and instructions, and their inadequate and misleading advertising, was a substantial contributing factor in causing harm to Plaintiff.

177.    As a direct and proximate result of Defendants' conduct, including actions, omissions, and misrepresentations, Plaintiff sustained the following damages:

   a.    Economic losses including medical care and lost earnings; and

   b.    Noneconomic losses including physical and mental pain and suffering, infertility, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

**COUNT FOUR**
**NEGLIGENCE**
**(DESIGN AND/OR MANUFACTURING DEFECT)**

178.    Plaintiff repeats and realleges all allegations as if fully set forth herein.

179.    At all relevant times. Defendants engaged in the design, development, manufacture, marketing, sale, and distribution of the Products in a defective and unreasonably dangerous condition to consumers, including Plaintiff.

180.   Defendants caused the Products to enter the stream of commerce and to be sold through various retailers, where Plaintiff purchased the Products.

181.   The Products were expected to, and did, reach consumers, including Plaintiff, without change in the condition in which it was manufactured and sold by Defendants and/or otherwise released into the stream of commerce.

182.   Plaintiff used the Products in a manner normally intended, recommended, promoted, and marketed by Defendants.

183.   Products failed to perform safely when used by Plaintiff in a reasonably foreseeable manner, specifically increasing her risk of developing cancer.

184.   The propensity of phthalates and other endocrine receptive chemicals to trigger cancerous growths in premenopausal women, including, but not limited to, the uterus, thereby substantially increasing the risk of cancer, including, but not limited to, uterine and ovarian cancer, renders the Products unreasonably dangerous when used in the manner it was intended and to an extent beyond what would be contemplated by the ordinary consumer.

185.   Importantly, the Products are an inessential cosmetic product that do not treat or cure any serious disease. Further, safer alternatives, including fragrance free products, have been readily available for decades.

186.   Defendants knew, or by the exercise of reasonably care should have known, that the Products are unreasonably dangerous but have continued to design, manufacture, sell, distribute, market, promote, and supply the Products so as to maximize sales and profits at the expense of public health and safety in conscious disregard of the foreseeable harm to the consuming public, including Plaintiff.

187.   Defendants owed a duty to all reasonably foreseeable users to design a safe product.

188.   Defendants breached their duty by failing to use reasonable care in the design and/or manufacturing of their Products because the Products were

unreasonably dangerous in that they increase the risks of cancerous growths in premenopausal women, including, but not limited to, the uterus, thereby substantially increasing the risk of cancer, including, but not limited to, uterine and ovarian cancer, renders the Products unreasonably dangerous when used in the manner it was intended and to an extent beyond that would be contemplated by the ordinary consumer.

189.   Defendants also breached their duty by failing to use reasonable care by failing to use cost-effective, reasonably feasible alternative deigns in the design and/or manufacturing of their Products.

190.   A reasonable company under the same or similar circumstances would have designed a safer product.

191.   As a direct and proximate result of Defendants' conduct, including actions, omissions, and misrepresentations, Plaintiff sustained the following damages:

        a.     Economic losses including medical care and lost earnings; and

        b.     Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

**COUNT FIVE**
**NEGLIGENCE**
**(NEGLIGENCE AND/OR GROSS NEGLIGENCE)**

192.   Plaintiff repeats and realleges all allegations as if fully set forth herein.

193.   The Defendants' negligence and extreme carelessness includes, but is not limited to, their marketing, designing, manufacturing, producing, supplying, inspecting, testing, selling and/or distributing the Products in one or more of the following respects:

        a.     In failing to warn Plaintiff of the hazards associated with the use of the Products;

b.      In failing to properly test their products to determine adequacy, effectiveness, or safety measures, if any, prior to releasing the Products for consumer use;

c.      In failing to properly test their products to determine the increased risk of uterine cancer during the normal and/or intended use of the Products;

d.      In failing to inform ultimate users, such as Plaintiff, as to the safe and proper methods of handling and using the Products;

e.      In failing to remove the Products from the market when Defendants knew or should have known the Products were defective;

f.      In failing to instruct the ultimate users, such as Plaintiff, as to the methods for reducing the type of exposure to the Products which caused increased risk of cancer, including, but not limited to, uterine and ovarian cancer;

g.      In failing to inform the public in general and Plaintiff in particular of the known dangers of using the Products;

h.      In failing to advise users how to prevent or reduce exposure that caused increased risk for cancer, including, but not limited to, uterine and ovarian cancer;

i.      In marketing and labeling the Products as safe for all uses despite knowledge to the contrary;

j.      In failing to act like a reasonably prudent company under similar circumstances. Each and all of these acts and omissions, taken singularly or in combination, were a proximate cause of the injuries and damages sustained by Plaintiff.

194.   At all pertinent times, the Defendants knew or should have known that the Products were unreasonably dangerous and defective when put to their reasonably anticipated use.

195.   Defendants' acts and/or omissions constitute gross negligence because they constitute a total lack of care and an extreme departure from what a reasonably careful company would do in the same situation to prevent foreseeable harm to Plaintiff.

196.   Defendants acted and/or failed to act willfully, and with conscious and reckless disregard for the rights and interests of Plaintiff, and their acts and omissions had a great probability of causing significant harm and in fact resulted in such harm to Plaintiff.

197.   Plaintiff was injured as a direct and proximate result of negligence and/or gross negligence as described herein.

198.   Defendants' negligence and/or gross negligence were a substantial factor in causing and/or contributing to Plaintiff's harms.

199.   Plaintiff sustained the following damages as a foreseeable, direct, and proximate result of Defendants' acts and/or omissions:

a.   Economic losses including medical care and lost earnings; and

b.   Noneconomic losses including physical and mental pain and suffering, infertility, emotional distress, inconvenience, and loss of enjoyment and impairment of quality of life, past and future.

**COUNT SIX**
**NEGLIGENCE**
**(NEGLIGENT MISREPRESENTATION)**

200.   Plaintiff repeats and realleges all allegations as if fully set forth herein.

201.   Defendants had a duty to accurately and truthfully represent to consumers, Plaintiff, and the public, that the Products had been tested and found to be safe and effective for use. The representations made by Defendants, in fact, were false.

202.   Defendants negligently misrepresented that their Products were nourishing, protective, and did not have the high risk of unreasonable, dangerous, and adverse side effects to induce Plaintiff to purchase their Products.

203.   Defendants did not have reasonable grounds to believe their Products were nourishing, protective, and without adverse side effects based on their manufacture, sale, testing, quality assurance, quality control, and distribution of the Products.  Defendants knew, and had reason to know, that the Products had been insufficiently tested, or had not been tested at all, and that they lacked adequate and accurate warnings, and that they created a high risk, and/or higher than acceptable risk, and/or higher than reported and represented risk, of adverse side effects, including, but not limited to, cancer.

204.   Plaintiff justifiably relied on Defendants' misrepresentations that their Products were nourishing and did not have adverse side effects because Plaintiff used the Products as directed.

205.   Plaintiff sustained the following damages as a result of justifiably relying on Defendants' misrepresentations that the Products were nourishing, protective, and without side effects:

a.   Economic losses including medical care and lost earnings; and

b.   Noneconomic losses including physical and mental pain and suffering, infertility, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

## COUNT SEVEN
## VIOLATION OF UNFAIR COMPETITION LAW
### (CAL. BUS. & PROF. CODE §§ 17200 ET SEQ.)

206.   Plaintiff repeats and realleges all allegations as if fully set forth herein.

207.   California Business & Professions Code § 17200 prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising." Defendants violated each of this statute's three prongs.

208.   Defendants committed an unlawful business act or practice in violation of Cal. Bus. & Prof. Code § 17200, *et seq*., by systematically breaching its warranty

1   obligations and by violating the CLRA and the Song-Beverly Consumer Warranty

2   Act as alleged above and below.

3       209.   Defendants committed unfair business acts and practices in violation

4   of Cal. Bus. & Prof. Code § 17200, *et seq*., because the acts and practices described

5   herein, including but not limited to the marketing, designing, manufacturing,

6   producing, supplying, inspecting, testing, selling and/or distributing the Products

7   that cause cancer without warning were immoral, unethical, oppressive,

8   unscrupulous, unconscionable, and/or substantially injurious to Plaintiff.

9   Defendants' acts and practices were additionally unfair because the harm to

10  Plaintiff is substantial and is not outweighed by any countervailing benefits to

11  consumers or competition.

12      210.   Defendants committed fraudulent business acts and practices in

13  violation of Cal. Bus. & Prof. Code § 17200, *et seq*., when it concealed and/or

14  misrepresented that the Products were nourishing, protective, and without adverse

15  side effects.

16      211.   Defendants' misrepresentations and concealment that their Products

17  are nourishing, protective, and without adverse side effects are likely to mislead and

18  cause the public to believe their Products do not cause cancer.

19      212.   Defendants' unfair or deceptive acts or practices occurred repeatedly

20  in the course of Defendants' trade or business, and were likely to mislead a

21  substantial portion of the purchasing public.

22      213.   Plaintiff relied on Defendants' material misrepresentations and

23  nondisclosures, and Plaintiff would not have purchased the Products had she known

24  the truth.

25      214.   As a direct and proximate result of Defendants' unfair, unlawful, and

26  deceptive practices, Plaintiff has lost money and suffered from cancer.

27

28

215.    Plaintiff seeks an order enjoining Defendants from committing such unlawful, unfair, and fraudulent business practices, and seeks restitution pursuant to Cal. Bus. & Prof. Code § 17203.

**COUNT EIGHT**
**VIOLATION OF THE CONSUMER LEGAL REMEDIES ACT PRACTICES ACT**
**(CAL. CIV. CODE § 1750 ET SEQ.)**

216.    Plaintiff repeats and realleges all allegations as if fully set forth herein.

217.    The Consumer Legal Remedies Act "CLRA" prohibits unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer." Cal. Civ. Code § 1770(a).

218.    Defendants are "persons" as defined by the CLRA.

219.    Plaintiff is a "consumer" who purchased the Products for personal, family, or household purposes.

220.    Plaintiff's purchases of the Products constitutes "transactions" as defined by the CLRA.

221.    The Products and their warranties constitute "goods" or "services" as defined by the CLRA.

222.    Defendants' misrepresentations, active concealment, failures to disclose, and omissions regarding the Products and the warranties violated the CLRA in the following ways:

a.    Defendants represented that the Products have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have in violation of Cal. Civ. Code § 1770(a)(5);

b.    Defendants misrepresented that the Products and the warranties were of a particular standard, quality, or grade when they were of another (Cal. Civ. Code § 1770(a)(7));

1       c.      Defendants advertised the Products with an intent not to sell

2   them as advertised (Cal. Civ. Code § 1770(a)(9)).

3       223.   Defendants' unfair and deceptive acts or practices occurred repeatedly

4   in Defendants' course of trade or business, were material and capable of deceiving a

5   substantial portion of the purchasing public, and as a result, caused economic harm

6   to Plaintiff.

7       224.   Defendants knew or should have known that their Products were

8   defectively designed or manufactured, would cause cancer, and were not suitable

9   for their intended use.

10      225.   Defendants had exclusive knowledge of material facts concerning

11  cancer-causing ingredients in their Products, including phthalates and other

12  endocrine disrupting chemicals, and actively concealed that these ingredients were

13  in their Products from consumers.

14      226.   Furthermore, Defendants also falsely represented that their Products

15  were nourishing, protective, and without adverse side effects.

16      227.   Defendant had a duty to disclose that their Products contained

17  cancerous chemicals because:

18          a.      Defendants were in a superior position to know details about the

19  ingredients in their Products;

20          b.      Plaintiff could not reasonably have been expected to learn or

21  discover that the Products contained cancer causing chemicals;

22          c.      Defendants knew that Plaintiff could not reasonably have been

23  expected to learn or discover that their Products contained cancer causing

24  chemicals.

25      228.   The facts concealed or not disclosed by Defendants to Plaintiff are

26  material, in that a reasonable consumer would have considered them to be

27  important in deciding whether or not to purchase the Products.  Moreover, a

28

1    reasonable consumer would consider the presence of cancer causing chemicals

2    material to the purchase and use of the Products as Plaintiff did.

3         229.   Had Plaintiff known that the Products could cause cancer, Plaintiff

4    would not have purchased or used the Products.  Plaintiff justifiably relied on

5    Defendants' misrepresentations and nondisclosures.

6         230.   Plaintiff is a reasonable consumer who did not expect the Products to

7    cause cancer.  It is a reasonable and objective consumer expectation for consumers

8    to expect the Products not to cause cancer when used as instructed by Defendants.

9         231.   As a result of Defendants' unfair or deceptive acts or practices,

10   misrepresentations, and nondisclosures, Plaintiff sustained the following damages:

11             a.     Economic losses including medical care and lost earnings; and

12             b.     Noneconomic losses including physical and mental pain and

13   suffering, emotional distress, inconvenience, loss of enjoyment and impairment of

14   quality of life, past and future.

15        232.   Plaintiffs is entitled to equitable relief

16        233.   Thus, pursuant to Cal. Civ. Code § 1780, Plaintiffs seek equitable

17   relief, attorneys' fees and costs, and any other relief the Court deems proper.

18                           **COUNT NINE**
                        **FALSE ADVERTISING LAW**
19          **(CAL. BUS. & PROF. CODE §§ 17500 ET SEQ.)**

20        234.   Plaintiff repeats and realleges all allegations as if fully set forth herein.

21        235.   The False Advertising Law ("FAL") prohibits business from

22   disseminating statements that are "untrue or misleading, and which is known, or

23   which by the exercise of reasonable care should be known, to be untrue or

24   misleading." Cal. Bus. & Prof. Code § 17500.

25        236.   Defendants knew or should have known that their Products were

26   defectively designed or manufactured, would cause cancer, and were not suitable

27   for their intended use.

28

237.   Defendants had exclusive knowledge of material facts concerning cancer-causing ingredients in their Products, including phthalates and other endocrine disrupting chemicals, and actively concealed that these ingredients were in their Products from consumers.

238.   Furthermore, Defendants misled the public because they falsely represented that their Products were nourishing, protective, and without adverse side effects when used as instructed, and these misrepresentations were likely to deceive the general consuming public and the targeted consumers who used the product as instructed like Plaintiff.

239.   Defendant had a duty to disclose that their Products contained cancer-causing ingredients because:

a.   Defendants were in a superior position to know details about the ingredients in their Products;

b.   Plaintiff could not reasonably have been expected to learn or discover that the Products contained cancer causing chemicals;

c.   Defendants knew that Plaintiff could not reasonably have been expected to learn or discover that their Products contained cancer causing chemicals.

240.   The facts concealed and misrepresented by Defendants to Plaintiff are material in that a reasonable consumer would have considered them to be important in deciding whether or not to purchase the Products.  Moreover, a reasonable consumer would consider the presence of cancer-causing chemicals material to the purchase and use of the Products as Plaintiff did.

241.   Had Plaintiff known that the Products could cause cancer, Plaintiff would not have purchased or used the Products.  Plaintiff justifiably relied on Defendants' misrepresentations and nondisclosures.

- 50 -

242. Plaintiff is a reasonable consumer who did not expect the Products to cause cancer. It is a reasonable and objective consumer expectation for consumers to expect the Products not to cause cancer when used as instructed.

243. As a result of Defendants' unfair or deceptive acts or practices, misrepresentations, and nondisclosures, Plaintiff sustained the following damages:

a. Economic losses including medical care and lost earnings; and

b. Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

244. Plaintiff seeks Plaintiffs seek equitable relief, attorneys' fees and costs, and any other relief the Court deems proper.

## COUNT TEN
## FRAUD

245. Plaintiff repeats and realleges all allegations as if fully set forth herein.

246. Defendants, who engaged in the development, manufacture, marketing, sale and distribution of cosmetic and personal care products, including the Products, owed a duty to provide accurate and complete information.

247. Defendants fraudulently misrepresented the use of the Products as safe and effective, specifically:

a. Defendants L'Oréal's Products are intentionally labeled as "Botanicals" and with "Natural" ingredients that are "Ultra Nourishing," including but not limited to using "Natural Plant Oils and Butters;" that promote "Healthy Hair;"

b. Defendant Namaste's Products are marketed as "Olive Oil" products to imply natural products, and their Products are advertised as being "Build in Protection;"

c. Defendant Namaste's website states that their Products use "Rich Olive and Avocado Oils" that they claim "moisturize and condition while Aloe Vera protects the skin and scalp."

d. Defendant Namaste's represents its Products "use[] the latest technology to safely elongate tight coils."

e. Defendant Namaste go so far as to represent that "key features" of their product provides "protection and creates 'quality' and 'healthy-looking' hair.

f. Defendant Godrej represents that its Products "strengthen and protects", as well as nourishes, hair.

g. Defendant Strength of Nature represents that its Products "nourishes" hair, creates "healthy looking" hair, and promotes hair growth.

248. Defendants knew that these misrepresentations were material, and that they were false, incomplete, misleading, deceptive and deceitful when they were made.

249. Defendants made the misrepresentations for the purpose of deceiving and defrauding consumers, including Plaintiff, with the intention of having them act and rely on such misrepresentations.

250. Plaintiff relied, with reasonable justification, on the misrepresentations by Defendants, that hair relaxers were nourishing and protective, which induced her to purchase and use the Products on a regular basis. Had Defendants disclosed the adverse side-effects of the Products, Plaintiff would not have purchased or used them.

251. Defendants profited, significantly, from their unethical and illegal conduct that fraudulently induced Plaintiff, and millions of other consumers, to purchase these dangerous and defective Products.

252. Defendants' actions, and Plaintiff's justifiable reliance thereon, caused Plaintiff to purchase and use the Products to her detriment.

253.   As a foreseeable, direct, and proximate result of the aforementioned fraudulent misrepresentations by Defendants, Plaintiff sustained the following damages:

        a.    Economic losses including medical care and lost earnings; and

        b.    Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

**COUNT ELEVEN**
**FRAUDULENT CONCEALMENT**

254.   Plaintiff repeats and realleges all allegations as if fully set forth herein.

255.   Defendants owed consumers, including Plaintiff, a duty to fully and accurately disclose all material facts regarding the Products, not to conceal material defects related thereto, not to place these defective Products into the stream of commerce, and to fully and accurately label the Products. To the contrary, Defendants explicitly and/or implicitly represented that the Products were safe, effective, and healthy.

256.   Defendants actively and intentionally concealed and/or suppressed material facts, in whole or in part, to induce consumers, including Plaintiff, to purchase and use the Products and did so at her expense. Specifically:

        a.    Defendants have been aware of the positive association between DEHP used in their products and an increased risk of cancer, demonstrated by epidemiology studies since at least 2015 that exposure to the phthalates in their products enhance invasive and proliferative activities of endometrial cells.

257.   Recent studies have established a statistically significant correlation between Defendants' Products and uterine cancer.

258.   Defendants made concealed material facts regarding the adverse side effects of the Products for the purpose of deceiving and defrauding Plaintiff and with the intention of having her act and rely on misrepresentations and omissions.

259.   Defendants knew that their concealments, misrepresentations and omissions were material, and that they were false, incomplete, misleading, deceptive, and deceitful when they were made. Alternatively, Defendants concealed information, and/or made the representations with such reckless disregard for the truth that knowledge of the falsity can be imputed to them.

260.   Defendants profited, significantly, from their unethical and illegal conduct that caused Plaintiff to purchase and habitually use the dangerous and defective Products.

261.   Defendants' actions and representations, and Plaintiff's justifiable reliance thereon, caused her injury and damages.

262.   Had Defendants disclosed the adverse side-effects of the Products, Plaintiff would not have purchased or used them.

263.   Plaintiff sustained the following damages as a result of Defendants' acts and/or omissions:

      a.     Economic losses including medical care and lost earnings; and

      b.     Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

## COUNT TWELVE
## BREACH OF EXPRESS WARRANTY

264.   Plaintiff repeats and realleges all allegations as if fully set forth herein.

265.   The Defendants expressly warranted, through direct-to-consumer marketing, advertisements, and labels, that the Products were safe and effective for reasonably anticipated users.

266.   The Products did not conform to these express representations because they cause serious injury when used in the manner directed by Defendants in the form of cancer, including, but not limited to, uterine cancer.

2735069.3

1    267.   Plaintiff sustained the following damages as a foreseeable, direct, and
2    proximate result of Defendants' acts and/or omissions:

3              a.    Economic losses including medical care and lost earnings; and

4              b.    Noneconomic losses including physical and mental pain and
5    suffering, emotional distress, inconvenience, loss of enjoyment and impairment of
6    quality of life, past and future.

7                            **COUNT THIRTEEN**
                    **BREACH OF IMPLIED WARRANTIES**
8

9    268.   Plaintiff repeats and realleges all allegations as if fully set forth herein.

10   269.   At the time the Defendants manufactured, marketed, labeled,
11   promoted, distributed and/or sold the Products, the Defendants knew of the uses for
12   which the Products were intended and impliedly warranted the Products to be of
13   merchantable quality and safe for such use.

14   270.   Defendants breached the implied warranty of merchantability because
15   the Products did not pass without objection in the trade under their descriptions,
16   were not fit for the ordinary purpose for which such goods are used, nor were they
17   adequately contained, packaged, and labeled.  The Products contained defects in the
18   form of cancerous chemicals that caused adverse side effects, including, but not
19   limited to, cancer that created substantial risks to the health and safety of
20   consumers, like Plaintiff, when used as instructed.  The Defendants failed to
21   disclose the substantial risks of the Products, when used as instructed in its
22   instructions, packaging, and labeling.

23   271.   Plaintiff sustained the following damages as a foreseeable, direct, and
24   proximate result of Defendants' acts and/or omissions:

25             a.    Economic losses including medical care and lost earnings; and

26             b.    Noneconomic losses including physical and mental pain and
27   suffering, emotional distress, inconvenience, loss of enjoyment and impairment of
28   quality of life, past and future.

**COUNT FOURTEEN**
**BREACH OF EXPRESS WARRANTY PURSUANT TO SONG-BEVERLY WARRANTY ACT (CAL. CIV. CODE §§ 1790 ET SEQ.)**

272.   Plaintiff repeats and realleges all allegations as if fully set forth herein.

273.   The Products are "consumer goods" as defined by the Song-Beverly Warranty Act ("SBWA").

274.   Defendants at all times were "manufacturers" and/or "sellers" of the defective Products.

275.   Plaintiff purchased Products designed, manufactured, warranted, marketed to her, and intended to be purchased and used by consumers like her.

276.   The Defendants expressly warranted, through direct- to-consumer marketing, advertisements, and labels, that the Products were safe and effective for reasonably anticipated users.

277.   The Products did not conform to these express representations because they cause serious injury when used in the manner directed by Defendants in the form adverse side effects, including, but not limited to, cancer.

278.   Plaintiff sustained the following damages as a foreseeable, direct, and proximate result of Defendants' acts and/or omissions:

      a.   Economic losses including medical care and lost earnings; and

      b.   Noneconomic losses including physical and mental pain and suffering, infertility, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

**COUNT FIFTEEN**
**BREACH OF IMPLIED WARRANTY PURSUANT TO SONG-BEVERLY CONSUMER WARRANTY ACT (CAL. CIV. CODE §§ 1790 ET SEQ.)**

279.   Plaintiff repeats and realleges all allegations as if fully set forth herein.

280.   The Products are "consumer goods" as defined by the Song-Beverly Consumer Warranty Act ("SBCWA").

281.   Defendants at all times were "manufacturers" and/or "sellers" of the defective Products as defined by the SBCWA.

2735069.3

COMPLAINT

282.   Plaintiff purchased Products designed, manufactured, warranted, marketed to her, and intended to be purchased and used by consumers like her.

283.   At the time the Defendants manufactured, marketed, labeled, promoted, distributed and/or sold the Products, the Defendants knew of the uses for which the Products were intended and impliedly warranted the Products to be of merchantable quality and safe for such use.

284.   Defendants breached the implied warranty of merchantability because the Products did not pass without objection in the trade under their descriptions, were not fit for the ordinary purpose for which such goods are used, nor were they adequately contained, packaged, and labeled.  The Products contained defects in the form of cancerous chemicals that caused adverse side effects, including, but not limited to, cancer that created substantial risks to the health and safety of consumers, like Plaintiff, when used as instructed.  The Defendants failed to disclose the substantial risks of the Products, when used as instructed in its instructions, packaging, and labeling.

285.   Plaintiff sustained the following damages as a foreseeable, direct, and proximate result of Defendants' acts and/or omissions:

a.   Economic losses including medical care and lost earnings; and

b.   Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

**COUNT SIXTEEN**
**BREACH OF EXPRESS WARRANTY PURSUANT TO MAGNUSON-MOSS WARRANTY ACT (14 U.S.C §§ 2301 ET SEQ.)**

286.   Plaintiff repeats and realleges all allegations as if fully set forth herein.

287.   The Products are "consumer products" as defined by the Magnuson-Moss Warranty Act ("MMWA").

288.   Plaintiff at all times was a consumer as defined by the MMWA.

289.   Defendants at all times were "suppliers" and "warrantors" of the defective Products as defined by the MMWA.

290.   Plaintiff purchased Products designed, manufactured, warranted, marketed to her, and intended to be purchased and used by consumers like her.

291.   The Defendants expressly warranted, through direct- to-consumer marketing, advertisements, and labels, that the Products were safe and effective for reasonably anticipated users.

292.   The Products did not conform to these express representations because they cause serious injury when used in the manner directed by Defendants, in the form adverse side effects, including, but not limited to, cancer.

293.   Plaintiff sustained the following damages as a foreseeable, direct, and proximate result of Defendants' acts and/or omissions:

        a.   Economic losses including medical care and lost earnings; and

        b.   Noneconomic losses including physical and mental pain and suffering, infertility, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

## COUNT SEVENTEEN
## BREACH OF IMPLIED WARRANTY PURSUANT TO MAGNUSON-MOSS WARRANTY ACT (14 U.S.C §§ 2301 ET SEQ.)

294.   Plaintiff repeats and realleges all allegations as if fully set forth herein.

295.   The Products are "consumer products" as defined by the Magnuson-Moss Warranty Act ("MMWA").

296.   Plaintiff at all times was a consumer as defined by the MMWA.

297.   Defendants at all times were "suppliers" and "warrantors" of the defective Products as defined by the MMWA.

298.   Plaintiff purchased Products designed, manufactured, warranted, marketed to her, and intended to be purchased and used by consumers like her.

299.   At the time the Defendants manufactured, marketed, labeled, promoted, distributed and/or sold the Products, the Defendants knew of the uses for

1  which the Products were intended and impliedly warranted the Products to be of

2  merchantable quality and safe for such use.

3      300.   Defendants breached the implied warranty of merchantability because

4  the Products did not pass without objection in the trade under their descriptions,

5  were not fit for the ordinary purpose for which such goods are used, nor were they

6  adequately contained, packaged, and labeled.  The Products contained defects in the

7  form of cancerous chemicals that caused adverse side effects, including, but not

8  limited to, cancer, that created substantial risks to the health and safety of

9  consumers, like Plaintiff, when used as instructed.  The Defendants failed to

10 disclose the substantial risks of the Products, when used as instructed in its

11 instructions, packaging, and labeling.

12     301.   Plaintiff sustained the following damages as a foreseeable, direct, and

13 proximate result of Defendants' acts and/or omissions:

14          a.      Economic losses including medical care and lost earnings; and

15          b.      Noneconomic losses including physical and mental pain and

16 suffering, emotional distress, inconvenience, loss of enjoyment and impairment of

17 quality of life, past and future.

18                          **COUNT EIGHTEEN**
19                   **NEGLIGENT FAILURE TO RECALL**

20     302.   Plaintiff repeats and realleges all allegations as if fully set forth herein.

21     303.   At all relevant times, Defendants designed, developed, managed,

22 operated, inspected, tested (or not), marketed, advertised, promoted, disseminated,

23 made publicly available, and/or benefited from the Products and, therefore, owed a

24 duty of reasonable care to avoid causing harm to those who used the Products, such

25 as Plaintiff.

26     304.   Defendants knewor, through the exercise of reasonable care, should

27 have known, the risks to consumers posed by the Products.

28

305.   Defendants knew or, by the exercise of reasonable care, should have known, that use of the Products was harmful and had the potential to increase the risks of cancerous growths in premenopausal women, including, but not limited to, the uterus, thereby substantially increasing the risk of cancer, including, but not limited to, uterine cancer, renders the Products unreasonably dangerous when used in the manner it was intended and to an extent beyond that would be contemplated by the ordinary consumer.

306.   Defendants owed a duty to the users of the Products, including Plaintiff, to exercise reasonable care in conducting their business to properly and reasonably design, research, develop, manufacture, produce, process, assemble, inspect, supply, distribute, deliver, broker, market, warn, maintain, repair, modify, recall, retrofit, engineer, test, recommend, advertise, and/or make available the Products.

307.   Defendants also owed a continuing duty to Plaintiff to remove, recall, or retrofit the unsafe and/or defective platforms across the United States (including in Plaintiff's state).

308.   As discussed, Defendants knew or reasonably should have known that the Products were dangerous and not safe for use.

309.   Defendants knew or, in the exercise of reasonable and ordinary care, should have known, that the Products were defective and unsafe for Plaintiff, who is a person likely to use the Products for the purpose and in the manner for which the Products were intended to be used and for purposes reasonably foreseeable to Defendants.

310.   However, at all times, Defendants negligently breached said duties and unreasonably and negligently allowed the Products to be used by Plaintiff without proper recall or retrofit or warning.

311.   Defendants have also not made any reasonable effort to remove and/or retrofit the serious safety risk posed by the Products to consumers.

312.   In failing to properly recall and/or retrofit the Products, or even warn of the serious safety risks the platforms pose to consumers and the public, Defendants have failed to act as a reasonable manufacturer, designer, or distributer would under the same or similar circumstances and failed to exercise reasonable care.

313.   Plaintiff was injured as a direct and proximate result of the negligent conduct as described herein.

314.   Plaintiff sustained the following damages as a foreseeable, direct, and proximate result of Defendants' acts and/or omissions:

      a.   Economic losses including medical care and lost earnings; and

      b.   Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

### COUNT NINETEEN
### MEDICAL MONITORING

315.   Plaintiff repeats and realleges all allegations as if fully set forth herein.

316.   At all relevant times, Defendants designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from the Products and, therefore, owed a duty of reasonable care to avoid causing harm to those who used the Products, such as Plaintiff.

317.   Defendants knew, or through the exercise of reasonable care, should have known, the risks to consumers posed by the Products.

318.   Defendants knew or, by the exercise of reasonable care, should have known, that use of the Products was harmful and had the potential to increase the risks of cancerous growths in premenopausal women, including, but not limited to, the uterus, thereby substantially increasing the risk of cancer, and renders the

1   Products unreasonably dangerous when used in the manner it was intended and to

2   an extent beyond that would be contemplated by the ordinary consumer.

3      319.   Defendants owed a duty to the users of the Products, including

4   Plaintiff, to exercise reasonable care in conducting their business to properly and

5   reasonably design, research, develop, manufacture, produce, process, assemble,

6   inspect, supply, distribute, deliver, broker, market, warn, maintain, repair, modify,

7   recall, retrofit, engineer, test, recommend, advertise, and/or make available the

8   Products.

9      320.   Defendants also owed a continuing duty to Plaintiff to remove, recall,

10  or retrofit the unsafe and/or defective platforms across the United States (including

11  in Plaintiff's state).

12     321.   As discussed, Defendants knew or reasonably should have known that

13  the Products were dangerous and not safe for use.

14     322.   As a direct and proximate result of Defendants' conduct, Plaintiff has

15  developed mental and physical health issues that will require life-long monitoring

16  treatment.

17     323.   As a direct and proximate result of Defendants' conduct, Plaintiff has a

18  significantly increased risk of developing a serious latent disease and/or injury,

19  suffering further injury at an unknown date in the future.

20     324.   Monitoring procedures exist that makes the early detection and

21  prevention of the above EDC-related and/or induced diseases and mental health

22  issues possible. Many of the above physical and mental issues can lead to other

23  long-term physical and mental health injuries that can be detected and prevented by

24  existing medical and psychological testing and treatment.

25     325.   These procedures are different from those normally recommended in

26  the absence of the exposure. These monitoring procedures include non-routine

27  surveillance studies, laboratory testing, and physical examinations, and would be

28  reasonably necessary according to contemporary scientific principles.

COMPLAINT

326.   The injuries Defendants' Products cause on the human body has already been inflicted in its users, such as Plaintiff, but the full extent of the injury will not manifest until later in Plaintiff's life. Thus, because of Defendants' conduct, it is reasonably necessary that Plaintiff be placed under periodic screening and/or diagnostic testing beyond that normally recommended in the absence of the issues Plaintiff has suffered due to use of these Products.

327.   Plaintiff demands judgment against Defendants for medical monitoring damages to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against Defendants on each of the above-referenced claims and causes of action, and as follows:

a.   Awarding compensatory damages in excess of $75,000, including, but not limited to pain, suffering, emotional distress, loss of enjoyment of life, and other non-economic damages in an amount to be determined at trial of this action;

b.   Awarding economic damages in the form of medical expenses, out of pocket expenses, lost earnings, and other economic damages in an amount to be determined at trial of this action;

c.   Punitive and/or exemplary damages for the wanton, willful, fraudulent, reckless acts of the Defendants who demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and Plaintiff, in an amount sufficient to punish Defendants and deter future similar conduct;

d.   Prejudgment interest;

e.   Postjudgment interest;

f.   Awarding Plaintiff's reasonable attorneys' fees;

1          g.      Awarding Plaintiff the costs of these proceedings; and

2          h.      Such other and further relief as this Court deems just and proper.

3                              **<u>JURY DEMAND</u>**

4          Plaintiffs hereby demand a trial by jury as to all claims so triable.

5    Dated:  January 13, 2023          Respectfully submitted,

6                                       LIEFF CABRASER HEIMANN &
                                        BERNSTEIN, LLP
7

8                                       By:
9                                           (Kelly M. Dermody

10                                      Kelly M. Dermody (State Bar No. 171716)
                                        kdermody@lchb.com
11                                      Fabrice N. Vincent (State Bar No. 160780)
                                        fvincent@lchb.com
12                                      LIEFF CABRASER HEIMANN &
                                        BERNSTEIN, LLP
13                                      275 Battery Street, 29th Floor
                                        San Francisco, CA  94111-3339
14                                      Telephone:  415.956.1000
                                        Facsimile:  415.956.1008
15

16                                      Lisa Holder (CA Bar No. 212628)
                                        lholder@equaljusticesociety.org
17                                      Mona Tawatao (CA Bar No. 128779)
                                        mtawatao@equaljusticesociety.org
                                        Equal Justice Society
18                                      1939 Harrison Street, Suite 818
                                        Oakland, CA 94612
19                                      Telephone: 415.288.8700
                                        Facsimile: 415.484.1530
20

21                                      Enrique Serna (pro hac vice forthcoming)
                                        enrique@serna-associates.com
22                                      SERNA & ASSOCIATES PLLC
                                        9901 IH10 West Suite 800
23                                      San Antonio, TX 78230
                                        Telephone: 210.472.2222
                                        Facsimile: 210.228.0839
24

25   *Attorneys for Plaintiff*

26

27

28